## UNITED STATES v. WATKINS.

District Court, N. D. California, S. D. October 18, 1927.

No. 18893.

**1. Criminal law ⊜97(4)—Prosecution for murder committed in Presidio of San Francisco held within jurisdiction of United States courts (18 USCA § 451; St. Cal. 1897, p. 51, supplementing St. Cal. 1891, p. 262; Joint Res. Oct. 22, 1914, No. 53, 38 Stat. 783; Act Aug. 29, 1916, 39 Stat. 637; St. Cal. 1917, p. 626).**

Presidio of San Francisco *held* under exclusive jurisdiction of United States, so that federal court has jurisdiction of prosecution for murder committed there, defined by Rev. St. § 5339 (18 USCA § 451), as defined by Pol. Code Cal. 33, since St. Cal. 1897, p. 51, supplementing St. Cal. 1891, p. 262, was act of cession with conditions attached which were fulfilled, in view of Joint Res. Oct. 22, 1914, No. 53, 38 Stat. 783, and Act Aug. 29, 1916, c. 418, 39 Stat. 637, and St. Cal. 1917, p. 626, notwithstanding insufficiency, if any, St. Cal. 1891, p. 262.

**2. States ⊜14—Provision of act ceding land to United States requiring recordation of map held complied with by recording authenticated copy of military map (St. Cal. 1897, p. 51; 5 USCA §§ 190, 191).**

Provision of St. Cal. 1897, p. 51, requiring recordation of map as condition of cession of certain lands to United States, *held* complied with by recording authenticated copy of military map, original being in custody of Judge Advocate General of Army, the custody of Secretary of War, under Rev. St. §§ 216, 217 (5 USCA §§ 190, 191).

Jesse R. Watkins was indicted for murder committed in the United States military reservation of the Presidio of San Francis-

co, and his motion for a directed verdict was denied. On determination of jurisdiction. District Court held to have jurisdiction.

George J. Hatfield, U. S. Atty., and Paul B. Gibson, Asst. U. S. Atty., both of San Francisco, Cal.

Bartley Crum and Thomas J. Riordan, both of San Francisco, Cal., for defendant.

ST. SURE, District Judge. The defendant was indicted for murder committed in the United States military reservation of the Presidio of San Francisco. At the trial defendant moved for a directed verdict, upon the ground that the court was without jurisdiction, and the acts charged did not constitute an offense against the United States, under section 5339, Revised Statutes (18 USCA § 451). The motion was denied.

The Presidio of San Francisco has been known as such since some 35 years prior to United States occupation, in use both by Mexican and American governments as a military reservation. By the Treaty of Guadalupe Hidalgo (9 Stat. 922) it, with the rest of the territory comprising the state of California, was ceded to the United States, and in 1850, on the admission of California into the Union, passed, without reservation of jurisdiction, to the state of California; the proprietary ownership remaining in the United States. In 1888, in this circuit, an indictment charging the crime of murder committed within the Presidio reservation, was quashed by Circuit Judges Sawyer and Hoffman. The court said: "We know of no other act of the state of California, through its Legislature or otherwise, by which a retrocession of its sovereign jurisdiction over the Presidio military reservation has been made to the United States. The result is the Presidio reservation is not within the exclusive jurisdiction of the United States, and the acts charged do not constitute an offense against the United States under section 5339, Rev. St., or of which this court has jurisdiction." United States v. Bateman (C. C.) 34 F. 86, containing a history of the status of the Presidio reservation to that time, reference to which is made for such information. The result, as quoted, indicates that the jurisdiction then lay in the state rather than the United States.

[1] At the time of the decision in the Bateman Case, the Political Code of California contained the following section, enacted in 1872:

"The sovereignty and jurisdiction of this state extends to all places within its boundaries as established by the Constitution, but the extent of such jurisdiction over places that have been or may be ceded to, purchased, or condemned by the United States, is qualified by the terms of such cession or the laws under which such purchase or condemnation has been or may be made." Pol. Code Cal. § 33.

It is apparent that, for jurisdiction of the United States to have become exclusive, or qualified, since the decision in the Bateman Case, it is necessary that a retrocession of jurisdiction from the state of California to the United States has been made; the extent and nature of the jurisdiction thus ceded depending upon the terms of the grant. In seeming recognition of this fact, the Legislature of the state enacted, in 1891 (St. 1891, p. 262), the following statute:

"Section 1. The state of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this state and the service of civil process therein.

"Sec. 2. This act shall take effect immediately."

The necessary requisites for jurisdiction over lands such as the Presidio, and others acquired by the United States in the various methods for acquisition, are fully stated and discussed in Ft. Leavenworth Railroad Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264. The Ft. Leavenworth Reservation stood, as to the jurisdiction of the United States, on almost the same footing as the Presidio of San Francisco, up to the time of retrocession by the state of Kansas of sovereignty to the United States. Under the authority of the Ft. Leavenworth Case it may well be said that the language of the act of 1891 ceded exclusive jurisdiction of the Presidio reservation to the United States. The clause, "for all purposes except the administration of the criminal laws of this state and the service of civil process therein," may be interpreted, quoting and applying the language by the Supreme Court at page 534, 5 S. Ct. 1000, to mean that "only * * * civil and criminal process issued under the authority of the state, which must, of course, be for acts done within and cognizable by the state, may be executed within the ceded lands, notwithstanding the cession. Not a word is said from which we can infer that it was intended that the state should have a right to punish for acts done within the ceded

lands. The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice for acts done within the acknowledged jurisdiction of the state."

[2] But evidently the act of 1891 was thought insufficient to confer exclusive jurisdiction in the United States, for in 1897 we find the state Legislature again passing upon the subject in the following language:

"Section 1. The state of California hereby cedes to the United States of America exclusive jurisdiction over all lands within this state now held, occupied, or reserved by the government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes: Provided, that a sufficient description by metes and bounds and a map or plat of such lands be filed in the proper office of record in the county in which the same are situated; and provided further, that this state reserves the right to serve and execute on said lands all civil process, not incompatible with this cession, and such criminal process as may lawfully issue under the authority of this state against any person or persons charged with crimes committed without said lands.

"Sec. 2. This Act shall take effect immediately."

Stats. Cal. 1897, p. 51.

A further act passed at the same session relinquishes the title of the state to lands from high-water mark to 300 yards beyond low-water mark, adjacent to islands held by the United States for military purposes or defense, with a reservation of civil and criminal process of the state identical with that in the act just noted, and conditioned, for validity of title in the United States, for the duration only of its holding and owning such adjacent lands. Stats. Cal. 1897, p. 74.

So far as this case is concerned it is admitted that the land upon which the crime was committed has been continuously occupied by the government since before California was admitted to the Union to the present time. Proof adduced at the trial shows that the Presidio lies within the city and county of San Francisco, and that a map of the Presidio, as then constituted, was filed for record in the office of the recorder of the city and county of San Francisco some time in 1897, presumably pursuant to the enactment mentioned. No appropriation for the purpose having been made, either by the state or federal government, formal recordation and binding in the book of maps never

took place, and the map was not found among the records saved from the fire and earthquake in 1906. What the map was is not shown with any exactitude, nor by whom, or under whose authority, it was filed.

Next appearing, however, is a map of the Presidio, entitled "Map of the Presidio of San Francisco, California, Prepared and Brought up to Date in the Office of the Post Quartermaster, Presidio, San Francisco, Cal. J. Hanson, Supt. of Construction, January, 1912, Scale 1"=500' "—with a notation in the upper left corner: "Identical maps filed: In proper office of record in county where reservation located; in office of the Department Adjutant; in office of Judge Advocate General of the Army; in post headquarters on the reservation. Blue prints in office of Dept. Judge Advocate and tracing in office Dept. Engineer." The entire space to the right of the map proper bears the heading and seal of the United States of America, War Department, followed by the certificate of E. H. Crowder, Judge Advocate General, United States Army, dated Washington, May 5th, 1913, "that the papers hereto attached are true copies of the description and map of the military reservation of the Presidio of San Francisco, California, on file in the office of the Judge Advocate General, United States Army." This is followed in turn by the certificate of the Secretary of War, Lindley M. Garrison, By John C. Scofield, Assistant and Chief Clerk, to the position of E. H. Crowder as Judge Advocate General, and that full faith and credit are to be given his certification as such, dated May 6, 1913. Following appears the legend, "Metes and bounds of the military reservation of the Presidio of San Francisco, California, as they appear from papers and maps of survey on file in the office of the Judge Advocate General, United States Army;" the metes and bounds set forth, and the statement appended, "Exclusive jurisdiction granted by Act of March 2, 1897, Cal. Stats. 1897, p. 51." Certification is completed by "A true transcript of original records. Arthur Murray, Major General, Commanding Western Department." A number, "N. 47586," appears over the statement: "Filed at the request of Major General Arthur Murray, U. S. Army, Commanding General, Western Department, on 28th day May, in year of our Lord 1913, at San Francisco, California. Edmond Godchaux, Recorder, by Chas. M. Stoltz, Deputy." The actual deposit of the map for recordation appears to have been made by Major Dennis P. Quinlan, Judge Advocate of the United States Army,

Western Department, acting for General Murray. The map was accepted for recordation and recorded as a duly authenticated copy of an official document or map of the War Department, the original being in the custody of the Judge Advocate General of the United States Army, the custody of the Secretary of War. Revised Statutes, § 217 (5 USCA § 191). The authority for its recordation is found in the Act of March 2, 1897 (Stats. Cal. 1897, p. 51), and is sufficient under that statute as an official map prepared in accordance with the requirements of the War Department, there being no specification in the act itself as to particulars necessary to its validity.

We have, then, an act of cession of the state of California, with conditions attached. The conditions are shown to have been complied with by the beneficiary, the United States. It is urged that, to complete the acquisition of jurisdiction under the act of cession, even with the conditions shown to have been complied with by the filing of the map and description of lands, there must be shown some act of acceptance on the part of the United States, either by act of Congress or executive order of the President. This may be answered as to the executive order, by the authority given the Secretary of War under Revised Statutes, § 216 (5 USCA § 190): "* * * and he shall conduct the business of the department in such manner as the President shall direct." It has been held, under this general language, that, in the absence of a statute or regulation to the contrary, orders issued and acts done by the Secretary of War, or by the subordinate officers acting under his authority, in the business of the War Department, are presumed to have been issued or done at the direction and by the authority of the President, though there is no express recital of the President's authorization or approval. Wilcox v. Jackson ex dem. M'Connel, 13 Pet. 498, 10 L. Ed. 264. It is more satisfactorily and completely answered, we think, by the language in Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 528, 5 S. Ct. 995, 997 (29 L. Ed. 264), in speaking of the saving clause in the act of cession by the state of Kansas to the United States of Ft. Leavenworth reservation: "As we have said, there is no evidence before us that any application was made by the United States for this legislation, but, as it conferred a benefit, *the acceptance of the act is to be presumed in the absence of any dissent on their part.*" If acceptance is necessary, sufficient acceptance appears, in the absence of any dissent on the

part of the United States; rather it appears affirmatively by the acts done in pursuance of the state statute on the subject.

In addition to the foregoing, and as having an important bearing upon the whole question now before this court, we find that in 1914 Congress passed a joint resolution ceding to the state of California temporary jurisdiction over certain lands in the Presidio of San Francisco, called the military reservation. Said lands to be used in connection with the Panama Pacific International Exposition. United States Statutes at Large, vol. 38, p. 783. The following language is contained in the preamble: "Whereas, the United States now has exclusive jurisdiction over the said military reservation." And this language in the resolution: "Provided, that jurisdiction to try and punish all crimes committed within said portions of said military reservations prior to the date that this cession becomes effective is reserved to the United States." And also this language: "Provided, further, that the cession of jurisdiction made by this resolution shall not take effect until the same is accepted by the Legislature of the state of California." Also this: "And provided, further, that when the United States shall resume possession of the said lands or any part thereof, the jurisdiction herein ceded over lands so repossessed shall revest in the United States."

In 1916 the Sixty-Fourth Congress passed an act, found in United States Statutes at Large, volume 39, at page 637: "Granting to the state of California permit to occupy portion of the Presidio for Palace of Fine Arts, etc., and ceding jurisdiction to the state of California in certain matters." The act provides "that the cession of jurisdiction made by this act shall take effect upon the termination of the cession of jurisdiction made by the Joint Resolution of Congress approved October 22, 1914, on the condition that the same is accepted by the Legislature of the state of California at its first session after the passage of this act, this cession to be without prejudice to the jurisdiction of the United States to try and punish all crimes committed within said portion of said military reservation prior to the date jurisdiction vested in the state under said joint resolution approved October 22, 1914: Provided, further, that when the United States shall resume possession of said lands, or any part thereof, the jurisdiction herein ceded over said lands so repossessed shall revest in the United States."

The lands thus temporarily ceded by the government to the state were carved out of

the easterly end of the Presidio reservation, over which the Congress declared the United States had exclusive jurisdiction. In conformity with this congressional action, the California Legislature passed an act in 1917 (St. Cal. 1917, p. 626), containing the following language: "The state of California hereby accepts from the United States government the cession of jurisdiction over that portion of the Presidio of the city and county of San Francisco military reservation designated by the Secretary of War for the use of the Panama Pacific International Exposition Company, and its successors in interest, pursuant to the act of Congress, * * * subject to the conditions, reservations, and stipulations contained in said act."

Here we have a claim of exclusive jurisdiction sanctioned by solemn congressional action, acquiesced in and accepted by similar legislative action upon the part of the state of California.

We think there can be no doubt about the question, and therefore hold that the Presidio of San Francisco is under the exclusive jurisdiction of the United States, and that the indictment charges an offense against the laws of the United States under section 5339 Revised Statutes.