[Civ. No. 4821. Fourth Dist. July 7, 1954.]

ROSALIE ACOSTA, Respondent, v. COUNTY OF SAN DIEGO, Appellant.

James Don Keller, District Attorney and County Counsel, and Olney R. Thorn, Deputy, for Appellant.

Robert A. Estes, T. A. Donnelley and Richard P. MacNulty for Respondent.

Edmund G. Brown, Attorney General, and Lee B. Stanton, Deputy Attorney General, Felix S. Cohen, Arthur Lazarus, Jr., and Rita Singer, as Amici Curiae on behalf of Respondent.

GRIFFIN, J.—This is an action for declaratory relief. Judgment was entered in favor of plaintiff, and defendant County of San Diego appealed. The sole question here presented is whether or not the Board of Supervisors of San Diego County has a duty, under sections 200 and 2500 of the Welfare and Institutions Code, to provide relief to the plaintiff, a needy Indian, and other Indians in like circumstances liv-

ing on government reservations in said county, or whether said county is only required to provide emergency relief to such persons under the provisions of section 2501 of the Welfare and Institutions Code.

Section 200, *supra*, provides generally that "Under such limitations and restrictions are as prescribed by law, and in addition to jurisdiction and powers otherwise conferred, the boards of supervisors in each county may provide for the care and maintenance of the indigent sick or dependent poor of the county, and for that purpose may levy the necessary property or poll taxes, or both." Section 2500 provides that "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, or by their own means, or by State hospitals or other State or private institutions." Section 2501 provides that "Every county may give such emergency relief to dependent nonresidents as the respective boards of supervisors deem necessary."

The facts are not in dispute. It is conceded that plaintiff is a needy person within the meaning of section 2500, *supra*, but contends that reservation Indians are not residents of the county for the purpose of obtaining direct county relief under the code sections involved.

Prior to April 13, 1951, the district attorney of San Diego County, observing the lack of uniformity existing in this state between the counties as to extending direct county indigent relief to reservation Indians, requested the attorney general for his opinion as to the duty of the county to provide such relief. On August 22, 1951, the attorney general expressed his opinion that there was such a duty. (18 Ops. Cal. Atty. Gen. 88.) On November 30, 1951, the district attorney advised the board of supervisors that he could not agree with the opinion of the attorney general and that it was his belief that such an expenditure of county funds would be illegal and a violation of article IV, section 31 of the Constitution of California. Relying upon the opinion of the attorney general, the Indian Bureau, on July 1, 1952, refused to provide direct relief to Indians residing on reservations in this state, although certain relief is given to reservation Indians residing in some other states. It appears from the record that at all times since July 1, 1952, the plaintiff has been relieved by payments from the county of San Diego under

the Emergency Relief section, which provides that the county may give emergency relief to dependent nonresidents. Both prior and subsequent to the first day of July, 1952, a contract existed between the Bureau of Indian Affairs and the county of San Diego under the "Joint Powers Agreements Act" (Gov. Code, §§ 6500-6512) whereby any medical or hospital services needed by the plaintiff or other Indians in like circumstances are provided for at the San Diego County General Hospital, the cost of which shall be paid to the county by warrant from the United States government. It has always been the policy of the county to treat any Indian living off of a reservation as an ordinary citizen of the county, and such Indians have always been given direct county relief when the need for such relief was established. Furthermore, by a contractual relationship between the state and the United States whereby this state is allowed to participate in the distribution of federal funds under the old age security program, the aid to needy blind program, and the aid to needy children program, Indians living on reservations have been given their full benefits under such programs when their eligibility has been established.

The Pala Indian Reservation, upon which plaintiff, a Mission Indian, has resided since her birth, consists of approximately 1,100 acres of land held in trust by the United States for the Pala Indians. Some of these Indians have been allotted some of this acreage in severalty, but none own the fee patent title. Plaintiff is registered voter in the Pala precinct, which includes the Pala Indian Reservation.

. It is therefore argued by appellant: (1) That the jurisdiction of the federal government over Indians while residing on Indian reservations is exclusive; that consequently, such Indians, while they are on the reservations, cannot be controlled nor governed by the laws of the state within which the reservations are located, citing *Donnelly* v. *United States,* 228 U.S. 243 [33 S.Ct. 449, 57 L.Ed. 820]; and 27 American Jurisprudence [Indians], page 572, section 47, and cases cited. (2) That reservation Indians are "wards of the Nation" under the guardianship of the United States government, and the superior court is without power to declare a termination of this relationship, citing *Lone Wolf* v. *Hitchcock,* 187 U.S. 553 [23 S.Ct. 216, 47 L.Ed. 299, 305]; *Tiger* v. *Western Investment Co.,* 221 U.S. 286 [31 S.Ct. 578, 55 L.Ed. 738, 739]; and *United States* v. *Kagama,* 118 U.S. 375 [6 S.Ct. 1109, 30 L.Ed. 228]; that a reservation Indian may become

subject to the burdens and obligations of state jurisdiction in two distinct manners: (a) he may abandon his residence upon the government reservation by moving onto nonreservation land within the state and county, or (b) the Congress of the United States, having exclusive jurisdiction over the Indians residing on reservations, may relinquish part or all of this jurisdiction to the states; that in the absence of such express relinquishment of exclusive jurisdiction by the federal government the California Reservation Indian today still stands in the position of a ward of the United States, not subject to the jurisdiction of the laws or courts of the State of California while he remains on the reservation. (3) It is contended that the Reservation Indians are not subject to the burdens or obligations of the laws of the county of San Diego or of the State of California and therefore are not entitled to the benefits of such laws while remaining on the reservations because they are not subject to taxation by either county or state authorities while residing thereon, citing *United States* v. *Rickert,* 188 U.S. 432 [23 S.Ct. 478, 47 L.Ed. 532]; and *United States* v. *Pearson,* 231 F. 270; that neither state nor county had jurisdiction over crimes committed on reservation lands by Indians on the day here in question, and had no right to pass any laws governing such Indians thereon in reference to their lands, nor to exercise the power of eminent domain over such property without the express consent of Congress, citing *People* v. *Carmen,* (Cal.)* 265 P.2d 900 [Rehearing granted by the Supreme Court]; *Elk* v. *Wilkins,* 112 U.S. 94 [5 S.Ct. 41, 28 L.Ed. 643]; that California Indians owe no allegiance to the State of California and receive no protection from such state, citing *United States* v. *Kagama, supra*; and *Plummer* v. *Hubbard,* 207 App.Div. 29 [201 N.Y.S. 747]; that an Indian reservation may compare with a military reservation within the state boundaries with respect to the jurisdiction of the State of California and, according to 1 Opinions Attorney General California 176, 178, the persons stationed upon the premises become isolated, both territorially and as respects their civil relations, and the land is no longer a part of the soil of the state "nor are the occupants inhabitants of the state"; and it is contended that this principle of exclusive jurisdiction of the United States has been recognized repeatedly by the

---

*The final opinion of the Supreme Court in *People* v. *Carmen* is reported in 43 Cal.2d —— [273 P.2d 521].

courts of this state, citing *United States* v. *Watkins*, 22 F.2d 437; *Pacific Coast Dairy, Inc.* v. *Department of Agriculture*, 19 Cal.2d 818 [123 P.2d 442]; *Consolidated Milk Producers For San Francisco* v. *Parker*, 19 Cal.2d 815 [123 P.2d 440].

In connection with the above contentions defendant concedes that Congress, by the adoption on August 15, 1953, of Public Laws 277, 280-281, 83rd Congress chaps. 502, 505 and 506, First Session, 18 U.S.C.A. section 1162 [1953 Annual Pocket Part], in conformance to a House Concurrent Resolution No. 108, has consented to a limited state jurisdiction, both civil and criminal, over Reservation Indians in California and intends to adopt legislation concerning the future right of taxation of their property by the state, and that "for all practical purposes the basic duty of law enforcement and criminal jurisdiction has been transferred from the federal government to the State of California" thereby, but contends that by the terms of this enactment, the United States government still remains in the position of guardian to its Indian wards residing upon reservation land, citing memorandum opinion of Commissioner of Indian Affairs dated August 24, 1953, commenting on the provisions of Public Laws 277 and 280, *supra*. It is defendant's argument that the removal of this restriction clearly indicates that the criminal and civil jurisdiction over Indians residing on the reservations was exclusively in the United States government prior to said date, otherwise the action taken by Congress conferring that right would have been needless legislation. (4) It is argued that the county is without jurisdiction to enforce the burdens of the relief statutes because under sections 2601-2605 of the Welfare and Institutions Code it may require, as a condition to the grant of aid to an indigent, as security for the money so expended, that the applicant transfer to it such property or interests in property as the applicant has, and may provide in the agreement for the control and sale of the indigent's property as a condition for receiving aid. It is therefore contended that any such agreement obtained from an Indian indigent residing on a reservation would be a nullity and unenforceable, and accordingly the board of supervisors could, for this reason, conclude that the applicant had not complied with the conditions required, and it might reasonably refuse aid, citing *Elk* v. *Wilkins*, 112 U.S. 94 [5 S.Ct. 41, 28 L.Ed. 643]. (5) Exception is taken to the remark of the trial judge, in his written opinion, that the Mission Indians do not belong to any tribe recognized as

such by the United States as a distinct political unit, and that the United States has never made any treaty with them nor treated them as a political group, contending that no evidence was produced on this subject, and if the trial judge made his conclusion from the history and development of the Indians of this county and their relations with the United States government, it was erroneous since there was a treaty entered into between the United States and the Cahuillas and Luisenos Indians of this state on January 5, 1952, and a similar one with the Diegueno Indians at Santa Isabella in this county on January 7, 1952. It is further contended that the courts have recognized that the Indians of San Diego County and Riverside County were "tribal Indians" in *Apapas* v. *United States*, 233 U.S. 587, 590 [34 S.Ct. 704, 58 L.Ed. 1104] ; *United States* v. *Kagama, supra*; and *Hicks* v. *Coleman*, 25 Cal. 122 [85 Am.Dec. 103]. (6) It is next argued that the fact that plaintiff exercised her right of franchise in the elections of this state does not necessarily meet the residential requirements for obtaining direct county relief; that the right to relief is a privilege rather than a right and that the adoption of section 2500, *supra,* by the Legislature may have placed a mandatory duty upon the county to provide relief under certain circumstances, but that it established a separate and distinct measurement for the determination of residence for such purpose, as prescribed in section 2555 of the Welfare and Institutions Code, which reads :

"A resident of the State of California is a person who comes within all the following descriptions :

"(a) Who has lived continuously in the State for a period of three years with the intent to make it his home.

"(b) Who, during the three-year period aforementioned, has not received any public or private relief or support from friends, charitable organizations, or relatives other than legally responsible relatives; . . ."

that since plaintiff has been receiving public support and relief during the last three-year period, the board of supervisors was justified in denying her relief under section 2500(b), *supra,* since there is no contention or showing that it acted arbitrarily or fraudulently in finding she did not meet the residential requirements, citing *Bila* v. *Young,* 20 Cal.2d 865 [129 P.2d 364] ; *Worcester* v. *Board of Supervisors,* 55 Cal.App.2d 883 [132 P.2d 276] ; and *Patten* v. *County of San Diego,* 106 Cal.App.2d 467 [235 P.2d 217]. (7) It is

next claimed that the admission to citizenship of all Indians born in the United States on Indian reservations and becoming naturalized under the Citizen's Act for Indians (Act of June 2d, 1924, 43 Stats. 253, 8 U.S.C.A. § 3) is not determinative of the question of residence and does not deprive the United States government of its power or duty toward the Indians, citing *United States* v. *Gray*, 201 F. 291 [119 C.C.A. 529]; 27 Am.Jur. [Indians], page 572, § 47, and cases cited.

It is the position of the county of San Diego that it stands willing and able to perform its obligation to the plaintiff and those Indians in like circumstances at such a time as the federal government emancipates the California Reservation Indians; that silence or nonaction on the part of Congress does not sanction the belief that it is the intent of the Government of the United States to divest itself of exclusive jurisdiction over Indians residing on government Indian reservations in the State of California; that by providing emergency relief under section 2501, *supra,* the county of San Diego has exercised its limited authority to the fullest extent the law permits, and to exceed these bounds would be to subject it to a possible violation of article IV, section 31 of the Constitution of California.

The attorney general, appearing as amicus curiae in support of his previous opinion and the Association on American Indian Affairs, Inc., in assisting in safeguarding the rights of American Indians, insists that there is no legal or factual justification for the exclusion of Indians living upon reservations from the operation of section 2500, *supra,* and that any such exclusion would be a violation of the Constitution and Civil Rights statutes of the United States.

■ In considering the questions raised, *ad seriatum,* 1, 2, 3, and 7, the conclusion is inescapable that the jurisdiction of the United States over the Indians residing on Indian reservations in California is not exclusive; that they are not "wards of the Government" in the sense that they are incompetent to acquire a residence in this state; and that the American Indians living upon such federal Indian reservations are residents of the state and county in which the reservation is located for certain purposes, even though they are, to a considerable extent, still subject to the jurisdiction of the United States government.

The decisions hold that the United States does not have exclusive jurisdiction over Indian reservations in all respects.

■ On the contrary, the state's jurisdiction extends to all matters which do not interfere with the control which the federal government has exercised over Indian affairs. ■ The principle that Indian reservations are geographically, politically and governmentally within the boundaries of the state wherein they are located, unless Congress, upon admission of the state into the union, or otherwise, has by express words excepted such areas from that jurisdiction, was laid down by the Supreme Court of the United States in *United States* v. *McBratney,* 104 U.S. 621 [26 L.Ed. 869]. See also *Draper* v. *United States,* 164 U.S. 240 [17 S.Ct. 107, 41 L.Ed. 419]; *Thomas* v. *Gay,* 169 U.S. 264 [18 S.Ct. 340, 42 L.Ed. 740]; and *People of the State of New York ex rel. Ray* v. *Martin,* 326 U.S. 496 [66 S.Ct. 307, 90 L.Ed. 261]. None of the 18 treaties entered into by the United States with Indians in California, including the ones referred to by the defendant county, were ever ratified by the Senate. ■ In the absence of such limiting treaty provisions, tribal lands within the state are part of the state and subject to its jurisdiction in many respects, regardless of whether or not the Indians themselves may be exempt from certain aspects of that jurisdiction. (*Langford* v. *Monteith,* 102 U.S. 145 [26 L.Ed. 53].)

As further evidence of this conclusion, the long history of federal legislation bearing on this issue should be considered. The states have been authorized by federal statute to enter upon Indian lands for the purpose of making inspection of health and educational conditions and enforcing sanitation and quarantine regulations, or for the purpose of enforcement of compulsory school attendance by Indian pupils. (45 Stats. 1185; 60 Stats. 962; 25 U.S.C.A. § 231.) The states may now tax the production of oil, gas and other minerals on unallotted Indian reservations. (43 Stats. 244; 25 U.S.C.A. § 398.)

Under the Federal Highway Act (42 Stats. 212) Indian lands in California were deemed as much a part of the area of the state as other private lands. Indian lands within the state are counted, along with public land, as a basis for additional federal road contributions. Reservation Indians are counted in the federal census as residents of California and are included in the population figures which are used not only for determining representation in Congress, but also as a basis for the allocation of positions in the federal civil service and as a basis for various contributions of the federal government to the education and welfare of the state. (Smith-Hughes Act of February 23, 1917 [Stats. 929]; George Barden

Vocation Act of August 1, 1946 [60 Stats. 775]; National School Lunch Act of June 4, 1946 [60 Stats. 230].) Such Indians are entitled to participate in both national and local elections. (*State ex rel. Crawford* v. *Norris,* 37 Neb. 299 [55 N.W. 1086]; *Harrison* v. *Leveen,* 67 Ariz. 337 [196 P.2d 456].) As citizens of the United States they are citizens of the state where they live. (*Deere* v. *State of New York,* 22 F.2d 851; United States Constitution, amendment XIV, § 1.) The territory in any Indian reservation of the United States government in the state may be formed into an elementary school district. (Cal. Ed. Code, §§ 2601 and 8026-8030.) Such Indians may participate in social security benefits generally administered by the state and federal government. Non-Indians living on California Indian reservations are recognized as residents of California. State Inheritance laws have been expanded over allotted Indians (§ 5, General Allotment Act of Feb. 8, 1887, 24 Stats. 388-389). States have been further authorized to condemn restricted Indian lands in accordance with state law. (§ 3, Act of Mar. 3, 1901, 31 Stats. 1058-1084, 25 U.S.C.A. p. 289, § 357.) State inheritance taxes may be applied to the restricted personal property of Indians. (*Oklahoma Tax Commission* v. *United States,* 319 U.S. 598 [63 S.Ct. 1284, 1285, 87 L.Ed. 1612].)

No Indian reservation in San Diego County is self-sufficient, and no resident of any such reservation can help traveling beyond its borders, nor can he escape ordinary state cigarette, gasoline, sales or use taxes. Reservation Indians who purchase or possess unrestricted property outside the reservation enjoy no more advantageous tax status than their white fellow citizens. It has been held that the state may tax cattle grazing upon Indian lands under a lease from the Indians. (*Thomas* v. *Gay, supra.*)

These are some of the indications that these Indians are *sui juris,* and are not, in a technical sense, "wards of the Government." It is further pointed out that such Indians residing on these reservations may sue in their own names and are not required to sue in the name of a guardian. (*Begay* v. *Sawtelle,* 53 Ariz. 304 [88 P.2d 999].) They are qualified to serve as jurors and are competent witnesses in judicial proceedings. They are subject to selective service and entitled to the benefits accruing therefrom. Under the Workmen's Compensation Act (Stats. 1917, pp. 831-841, § 11, subd. (d), it has been held that they are not to be considered as "incompetent" within the meaning of that act. (*Francisco*

v. *Industrial Acc. Com.*, 192 Cal. 635 [221 P. 373]; *Anderson* v. *Mathews*, 174 Cal. 537 [163 P. 902].)

The contention that the Mission Indians in California are wards of the federal government because they had a tribal form of government is not supported by the anthropologists, as indicated by Professor A. L. Kroeber, in his monograph on native culture in California, citing Heizer and Whipple on "The California Indians," page 27, stating:

"Tribes did not exist in California in the sense in which the word is properly applicable to the greater part of the North American continent. When the term is used it must therefore be understood as synonymous with 'ethnic group' rather than as denoting political unity."

These statutes and decisions rendered thereunder, viewed in the light of their broad goals, hardly show an intent on the part of the federal government to maintain strict "guardianship" over Indians living upon reservations. It is clear that this ordinary guardian-ward relationship does not exist between the United States and the Indians, although there are important similarities and suggestive parallels between the two relationships.

During the last 25 years a number of significant changes have taken place in the legal position of the American Indians which look to the continued lessening of the control by the United States over their activities. The argument that responsibility for reservation Indians rests exclusively on the federal government has been rejected by the courts. (*Harrison* v. *Laveen*, 67 Ariz. 337 [196 P.2d 456]; *Swift* v. *Leach*, 45 N.D. 437 [178 N.W. 437].) That reservation Indians are entitled to direct relief from either the state or county in which they reside was conceded in *State ex rel. Williams* v. *Kemp*, 106 Mont. 444 [78 P.2d 585]. The only issue there was which political body should bear the expense.

From the conclusion reached that Indians living on reservations in California are citizens and residents of this state, it must therefore follow that under section 1, Amendment XIV of the Constitution of the United States they are endowed with the rights, privileges and immunities equal to those enjoyed by all other citizens and residents of the state. (*Oyama* v. *State of California*, 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed 249]; *Takahashi* v. *Fish & Game Commission*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478]; *Peters* v. *Pauma School Dist. of San Diego County*, 91 Cal.App. 792 [267 P. 576].)

■ The fact that the Indians, while residing on Indian reservations, may be exempt from certain state and county taxes and other laws is not necessarily determinative of the question of their residence. It is conceded by defendant that a reservation Indian may become subject to the burdens and obligations of state jurisdiction if Congress relinquishes "part or all of this jurisdiction to the state." It is apparent that Congress has, in this respect, released a major portion of its assumed jurisdiction over the Indians.

The issue of whether Indians living upon reservations are subject to state laws and taxation is not necessarily pertinent to the issue before us. Many non-Indians in San Diego County live upon tax-exempt property belonging to federal or local government agencies or to religious institutions, but in no such case has this fact been considered a justification for the withholding of any public services. As was cogently pointed out by the Supreme Court of Arizona in *Harrison* v. *Laveen, supra,* while benefits have been granted by the federal government to members of various Indian tribes, these benefits are no different in character from those allowed to many other classes of citizens, such as federal employees, holders of tax-exempt securities and veterans. In no case has the enjoyment of such special rights or privileges served as a justification for the exclusion of any such favored group from participation in the ordinary rights of citizenship, including the right to equal treatment under state welfare laws.

The opinion of the attorney general (1 Ops. Cal. Atty. Gen. 176, 178) in reference to the residential status of persons stationed on military reservations, in view of the changing circumstances, has been rejected, and the appellate court, in *Arapajolu* v. *McMenamin,* 113 Cal.App.2d 824 [249 P.2d 318, 34 A.L.R.2d 1185], said, quoting from the syllabus:

"If California retains jurisdiction over a federal area sufficient to justify holding that the area remains a part of the state, a resident therein is a resident of the state and entitled to vote by virtue of the constitutionally granted right, and no express reservation of such right is necessary and no attempted express cession of such right to the United States could be effective."

And "Residence in California on lands held by the United States but over which the federal government does not accept exclusive jurisdiction is residence in California for voting purposes." (See also 20 Ops. Cal. Atty. Gen. p. 127.)

■ Contention No. 4 that since such Indians could not

transfer their interest in their trust property to the county, as security, if required to do so by the county, such inability justified the denial of relief, is not sustainable. The same situation may apply to any resident who may have some nontransferable interest in trust property. That fact alone would not justify the county in denying relief solely on this ground. If the Indians had sufficient property and could treat with that property as do non-Indians, they would not be eligible for relief for the reason that they would not be considered indigents. If it should develop that such Indians did have an assignable interest and refused to do so, a different question would then be presented.

As to Exception No. 5, it appears from the record and history of the treaties alleged that said treaties with the California Indians such as are referred to by the county, were never approved by the United States Senate and accordingly never became binding on the United States government. The statement of the trial judge, as indicated, is not erroneous.

As to Exception No. 6, it is true that the Welfare and Institutions Code does set forth in section 2555 the necessary residential requirements of any individual entitling him to receive direct county relief. The only question is whether the evidence establishes that plaintiff complied with subdivision (b) thereof in that she has not, during the three-year period, received any public or private relief or support from friends, charitable organizations or relatives, etc. 4 Opinions Attorney General California 199, and 14 Opinions Attorney General California 89, hold that section 2555, *supra*, applies only to individuals who have newly entered the county or the state. Since plaintiff has resided on an Indian reservation in this county since her birth that section is not applicable.

The decree holding that plaintiff is a resident of the county of San Diego, State of California, and that she is not disqualified from receiving the benefits provided for by section 2500 of the Welfare and Institutions Code by reason of the fact that she resides on an Indian reservation situated within the boundaries of this county must be sustained.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.